**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **LAKESHA WILLIAMS** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **No. 12 C 7802** |
| | ) |
| **SAFER FOUNDATION,** | ) **Magistrate Judge Finnegan** |
| **an Illinois not-for-profit corporation,** | ) |
| | ) |
| **Defendant.** | ) |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Lakesha Williams filed a two-count complaint charging her former employer, Safer Foundation, an Illinois not-for-profit corporation, with (1) subjecting her to a hostile work environment due to sexually harassing statements by her supervisor, and (2) retaliating against her for complaining about her supervisor's conduct, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991.

The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Defendant has now filed a motion for summary judgment on both counts of Plaintiff's complaint. For the reasons set forth below, the Court grants Defendant's motion for summary judgment on both of Plaintiff's claims.

## FACTUAL BACKGROUND[1]

### A.    The Parties

Defendant is a not-for-profit corporation that houses, educates and provides job training to criminal offenders until their release from incarceration, and locates employment opportunities for them following their release.  (Doc. 44 ¶ 1).  Defendant operates a correctional facility on behalf of the Illinois Department of Corrections called, "Crossroads Adult Transition Center" ("Center").  (*Id.* at ¶¶ 1-2).  Plaintiff was employed by Defendant as a Re-Entry Specialist in the "Halfway Back Program" at the Center, from August 20, 2007 until her termination on May 2, 2008.  (*Id.* at ¶ 2).  In that position, Plaintiff monitored the whereabouts and movements of the offenders at the Center, and reported to supervisors Ronald Burge ("Burge") and Phyllis Veal ("Veal").  (*Id.* at ¶¶ 2, 4; Doc. 49, at ¶ 1).

### B.    February 8, 2008 and February 9, 2008 Incidents at the Center

On February 8, 2008, Plaintiff was working in an office at the Center where Burge and a male co-worker, C.W. 1, were talking.  (Doc. 44 ¶ 4).  Plaintiff overheard Burge accuse C.W. 1 of dating a female co-worker, C.W. 2.  (*Id.*).  C.W. 1 denied that he was dating C.W. 2.  (*Id.*).  Burge then stated to C.W. 1, "You weren't acting like that when you had your dick in [C.W. 2's] mouth last night."  (*Id.*).  C.W. 1 responded to Burge by laughing.  (*Id.*).  Plaintiff "kind of felt offended" by the comments, and stated to Burge, "Now, you could have kept that to yourself."  (*Id.*).  Burge left the room after this

---

[1]     For ease of reference, citations in this opinion are to the docket number of the filings in this matter.  Plaintiff included two documents in her filing at docket number 49:  her response to Defendant's L.R. 56.1 Statement of Material Facts, and her L.R. 56.1 Statement of Additional Material Facts.  All citations to "Doc. 49" are to Plaintiff's Statement of Additional Material Facts, unless otherwise indicated.  Also, rather than identify Plaintiff's co-workers by name, the Court refers to them by the initials "C.W.," followed by a number.

conversation, and both Burge and Plaintiff completed their shifts for the day without further incident. (*Id.*).

The next day, February 9, 2008, Plaintiff was again working at the Center when a male friend dropped off a lunch and some medication for her. (Doc. 44 ¶ 5). After the friend left, Plaintiff, Burge and another female co-worker, C.W. 3, began a conversation. (*Id.*; Doc. 49 ¶ 3). Burge said to C.W. 3 that Plaintiff had been acting "funny" when her friend was at the Center, and Plaintiff stated that she "was not." (*Id.*). Burge then told Plaintiff that her friend had been "acting like a cat piss[ing] and mark[ing] his territory." (*Id.*). Burge further stated he was going to make Plaintiff's friend "real mad" the next time her friend visited the Center, by telling her friend that Plaintiff "is acting funny," and that she "wasn't acting that way when I had my dick in her mouth last night." (*Id.*). Plaintiff, surprised by the comment, asked Burge, "What did you say?" (*Id.*). Burge responded, "that's what I'm going to do," and repeated that the next time Plaintiff's friend visited, he would say that Plaintiff "[is] acting funny now, but she wasn't acting funny when I had my dick in her mouth." (*Id.*; *see also* Doc. 49 ¶ 6; Doc. 49-2 at 30).[2] Burge then left the room. (Doc. 44 ¶ 5).

Plaintiff had hurt feelings as a result of Burge's comments, and telephoned Burge later that day to ask "why he said what he said." (*Id.* at ¶ 6). Burge denied making the comments, wished Plaintiff a good evening, and hung up on her. (*Id.*). Plaintiff then finished her shift for the day. (*Id.*).

---

[2]     Defendant denies that the February 8 and 9, 2008 conversations occurred as Plaintiff describes them, but the Court accepts her versions of events in considering this motion. (Doc. 45, at 2 n.2; Doc. 52, at 2 n.3).

**C.**     **Plaintiff's Complaints to Human Resources and Defendant's Investigation**

On February 11, 2008, Plaintiff complained to Burge's direct supervisor, Earl Carr ("Carr"), regarding Burge's behavior. (Doc. 44 ¶ 8). The next day, February 12, 2008, Plaintiff also complained of Burge's behavior to Marketer Ash ("Ash"), Defendant's Human Resources Manager. (*Id.*). Plaintiff was instructed to put her complaints in writing, so she drafted an Incident Report, dated February 13, 2008, setting forth a description of the February 8 and 9, 2008 incidents. (Doc. 49 ¶ 2; Doc. 49-3, at 7). In the Incident Report, Plaintiff named herself and Burge as the staff involved in the incidents, and C.W. 1 and C.W. 3 as witnesses. (*Id.*). Human Resources Manager Ash then conducted at internal investigation, which included interviewing Plaintiff, Burge, C.W. 1, and C.W. 3, on February 21, 2008. (Doc. 44 ¶ 9; Doc. 49 ¶ 7; Doc. 49-3, at 18-19). In the interviews, C.W. 3 corroborated Plaintiff's version of the February 9, 2008 conversation, but C.W. 1 did not corroborate Plaintiff's version of the February 8, 2008 conversation, and Burge denied making any lewd remarks in either conversation. (*Id.*).

On February 29, 2008, Defendant held a meeting for all staff working in the Halfway Back Program. (Doc. 44 ¶ 11; Doc. 49 ¶ 9). Shortly after this meeting began, Burge expelled Plaintiff from the meeting, and she later complained to Supervisor Carr about being expelled. (Doc. 44 ¶¶ 11-12; Doc. 49 ¶ 9). Defendant alleges that Supervisor Carr questioned Burge, Veal and other staff at the meeting regarding the incident, and they stated Plaintiff was expelled for using vulgar, inappropriate language and being repeatedly disruptive. (Doc. 44 ¶¶ 11-12; *Id.* at 30-31). Defendant also alleges that Plaintiff was given a written warning regarding her conduct at the meeting, and submitted a document dated March 10, 2008 purporting to be the warning. (Doc.

44 ¶ 12; *Id.* at 33).   Plaintiff, on the other hand, denies that she used any vulgar or inappropriate language, or was otherwise disruptive in the meeting, alleges that she was expelled from the meeting after helping a late arrival "find his place," and does not recall receiving any written warning for her conduct.  (Doc. 49 ¶ 9; Pl's Resp. to Def.'s L.R. 56.1 Statement of Material Facts, Doc. 49, at ¶ 12).   For purposes of this motion, the Court accepts Plaintiff's version of events.

In early March 2008, Human Resources Manager Ash completed her memorandum regarding the investigation into Plaintiff's complaints.  (Doc. 44 ¶ 9; Doc. 49-3, at 18-19).   At that time, Ash disclosed to Plaintiff that the investigation produced inconclusive evidence, and advised Plaintiff that she should move on.  (*Id.*; *see also* Doc. 49 ¶ 8).

**D.    March 2008 Shift Change and Plaintiff's Attendance Issues**

Under Defendant's absence policies, employees were limited to a certain number of excused absences.   (Doc. 49 ¶10; Doc. 53 ¶ 10).   Re-Entry Specialist staff ("RES staff"), including Plaintiff, were also not allowed to use a sick day "in conjunction with" (that is, immediately before or after) a scheduled day off.  (Doc. 44 ¶ 15).   However, Defendant sometimes allowed RES staff to take time off in addition to their personal days, such as for a medical reason or funeral, or due to car problems, subject to a supervisor's approval.  (Doc. 53 ¶ 10; Doc. 49-4, at 34-35; Doc. 49-5, at 41).

Plaintiff accumulated one sick day per month while employed with Defendant, and was permitted to use her sick days following a 90 day probation period.  (Doc. 44 ¶ 15).   From her August 20, 2007 start date through and including March 9, 2008, a period of about six and a half months, Plaintiff called in sick ten times, including twice in

conjunction with a scheduled day off. (*Id.* ¶¶ 17-18). Four of those absences occurred in early March 2008, on March 5th, 6th, 8th and 9th. (*Id.*).

Around the time that Plaintiff was calling in sick in early March 2008, Defendant rotated the shifts of all RES staff at the Center, which operates 24 hours a day, 7 days a week. (Doc. 44 at ¶¶ 13-14). RES staff shifts are rotated every three to six months, at the direction of Defendant's vice president. (*Id.*). Prior to the shift change, Plaintiff complained to Veal that she needed more time to plan for the upcoming shift change, and stated she felt stressed about it, and about her job. (*Id.*). As a result, on March 10, 2008, Veal granted Plaintiff an additional week, until March 17, 2008, for her shift change to take effect, and referred her to the Employee Assistance Program for help dealing with the shift change and to improve her job performance. (*Id.*). Two days later, on March 12, 2008, Veal verbally warned Plaintiff that she had exhausted all of her available sick days. (*Id.* at ¶ 19). Nevertheless, the next day, March 13, 2008, Plaintiff called in sick again. (*Id.* at ¶ 20).

Following Plaintiff's absence, Veal issued Plaintiff a written warning, dated March 13, 2008, on behalf of herself, and Supervisors Carr and Burges. (Doc. 44 ¶ 19; *see also id.* at 36). The warning states that Plaintiff called in sick but had no sick time available, advises that her unavailability for work affected the Center's operational needs, and summarizes some of Defendant's policies regarding attendance issues. (*Id.* at 36). It further states that Plaintiff had missed a mandatory meeting on March 13, 2008, and that future incidents of a similar nature would result in suspensions and "progressive disciplinary actions up to and including termination." (*Id.*).

Plaintiff received the March 13, 2008 written warning on March 14, 2008, but then called in sick about a week later, on March 20, 2008, in conjunction with a scheduled day off. (*Id.* at ¶¶ 19-20). On March 22, 2008, Defendant alleges that it issued another warning to Plaintiff regarding her absences, which again stated that further incidents would result in "progressive disciplinary actions up to and including termination." (Doc. 44 ¶ 21). Defendant submitted a document purporting to be the warning, which contains a notation stating Plaintiff refused to sign it. (*Id.* at 38). Plaintiff denies that she received that warning, and this Court will assume that she did not receive it. (Pl's Resp. to Def.'s L.R. 56.1 Statement of Material Facts, Doc. 49, at ¶ 21).

Plaintiff then called in sick again on March 24, 2008, and was allegedly issued another written warning, dated March 31, 2008. (*Id.* at ¶¶ 22-23). The warning states that Plaintiff would be required to bring in a doctor's statement when she calls in sick, and Plaintiff produced a doctor's statement for the March 24, 2008 sick day. (*Id.* at 39; Pl's Resp. to Def.'s L.R. 56.1 Statement of Material Facts, Doc. 49., at ¶ 24). Plaintiff admitted in a deposition that she signed the March 31, 2008 warning on April 1, 2008, although she also testified that she did not remember receiving it, and now denies receiving it. (Pl's Resp. to Def.'s L.R. 56.1 Statement of Material Facts, Doc. 49, at ¶ 21; Doc. 44, at 39).

## E. Plaintiff's First EEOC Charge of Discrimination and Additional Absences

On April 3, 2008, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendant, stating that she had been subject to sexual harassment, complained about the harassment, and was disciplined in retaliation for making the complaint. (Doc. 49 ¶ 21; Doc. 1-1, at 2).

On April 5, 2008, Plaintiff again called in sick, and received a two-day suspension in connection with that absence, on April 6 and 7, 2008. (Doc 44 ¶ 24). Following her suspension, Plaintiff emailed Veal and Burge, with a copy sent to Carr, requesting to speak with a supervisor regarding the next shift rotation for the RES staff. (Doc. 44, at 40). Veal responded by email (copying Burge and Carr) on April 13, 2008, telling Plaintiff she had excessive call offs since she changed shifts, and that she should not be concerned about when the next rotation would take place, but should instead be concerned with herself. (*Id.*). Plaintiff then called in sick that day. (Doc. 44 ¶ 25). Two days later, on April 15, 2008, Plaintiff responded to Veal's email (including Burge and Carr on her response), stating that she did not want to change shifts in March 2008, agreeing that she had excessive call offs since the shift change, and requesting to speak with a supervisor regarding her work schedule concerns. (*Id.* at ¶ 26; *see also id.* at 40).

On April 24, 2008, C.W. 2, who was Plaintiff's team leader at the time, gave her a certificate of good attendance. (Doc. 49 ¶ 11). Defendant alleges that C.W. 2 was not authorized to give Plaintiff the certificate because attendance awards were not used by Defendant, and C.W. 2 was reprimanded for creating the certificate for Plaintiff. (Doc. 53 ¶¶ 11, 28). A few days after receiving the certificate of good attendance, on April 27, 2008, Plaintiff called in sick again. (Doc. 44 ¶ 25).

On April 29, 2008, Plaintiff requested the day off on May 1, 2008, via email to Burge, Veal and C.W. 2, with a copy sent to Carr. (Doc. 44 ¶ 27; *see also Id.* at 41). Plaintiff stated that she needed the day off to prepare for her uncle's funeral, which was set for the morning of May 2, 2008. (*Id.*). Burge emailed Plaintiff the same day in

response, stating that her request was denied because there was not sufficient staff to cover her May 1, 2008 shift. (*Id.*). Plaintiff then called in sick on May 1, 2008, because she was experiencing chest pains, and was told by Burge to supply a doctor's statement. (Doc. 44 ¶ 27; Doc. 49 ¶ 20). On May 2, 2008, Plaintiff was terminated on Veal's recommended, to which Burge agreed. (Doc. 49 ¶ 22; Doc. 53 ¶ 22). Defendant alleges that Plaintiff was terminated due to excessive absenteeism. (Doc. 44 ¶ 28). Plaintiff asserts that this was a pretextual reason, and the real reason she was terminated was for complaining to Defendant's human resources department, and filing her April 3, 2008 charge with the EEOC. (Pl's Resp. to Def.'s L.R. 56.1 Statement of Material Facts, Doc. 49, at ¶ 28).

## F.    Attendance Issues at the Center and Performance Improvement Plans

Defendant had numerous attendance issues with its employees. (Doc. 49 ¶ 12). Certain RES staff in the Halfway Back Program at the Center were given written Performance Improvement Plans ("PIPs") to alert them to attendance issues (and other infractions). (*Id.* at ¶¶ 13-18; Doc. 53 ¶¶ 13-18). PIPs explained to the recipients how they were expected to improve, and warned them that failure to improve would lead to disciplinary actions up to and including termination. (Doc. 53 ¶ 13). Some of the same people who received PIPs also received written warnings similar to the warnings issued to Plaintiff. (Doc. 49 ¶¶ 16-18). Several of the RES staff in the Halfway Back Program who were supervised by Veal and Burge, and received PIPs, were eventually terminated for excessive absenteeism. (Doc. 44 ¶¶ 29-31). Plaintiff, on the other hand, was never issued a PIP prior to her termination. (Doc. 49 ¶ 14).

**G.     Plaintiff's Second EEOC Charge Regarding Her Discharge**

On June 2, 2008, Plaintiff filed another Charge of Discrimination with the EEOC. (Doc. 1-3, at 2).  It stated that she had complained to Defendant's human resources regarding sexual harassment, filed a Charge of Discrimination with the EEOC, and was subsequently discharged on May 2, 2008, in retaliation for her complaints and EEOC filing.  (*Id.*).  The EEOC issued Plaintiff a Notice of Right to Sue for both of her Charges of Discrimination on July 5, 2012.  (Doc. 1-2, at 2; Doc. 1-4, at 2).  Plaintiff subsequently filed this suit on September 28, 2012.  (Doc. 1).

## DISCUSSION

**A.     Summary Judgment Legal Standard**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The party seeking summary judgment bears the burden of demonstrating that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Because the plaintiff bears the ultimate burden of persuasion, the defendant's summary judgment burden may be discharged by showing that there is an absence of evidence to support the plaintiff's case.  *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014) (quoting *Celotex*, 477 U.S. at 325)).

At the summary judgment stage, a court's function is not to "weight the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  In making this

determination, courts "view all facts and draw all reasonable inferences in favor of the nonmoving party." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 277 n.1 (2009) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004) (*per curiam*)). If a court determines there is no genuine dispute as to any material fact and a movant is entitled to judgment as a matter of law, the court will grant summary judgment. FED. R. CIV. P. 56(a); *see also Anderson*, 477 U.S. at 250 (citing FED. R. CIV. P. 56).

## B.    Plaintiff's Hostile Work Environment Claim

Plaintiff's first claim alleges that Defendant subjected her to a hostile work environment due to Burge's sexual harassing comments on February 8 and 9, 2008. "Title VII prohibits the creation of a hostile work environment." *Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014) (quoting *Vance v. Ball State Univ.*, 133 S.Ct. 2434, 2441 (2013)). That is, the statute prohibits employers from "discriminating against any individual with respect to his . . . terms [or] conditions . . . of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a). Therefore, to avoid summary judgment on a hostile work environment claim based on gender, a plaintiff must establish that (1) her work environment was both subjectively and objectively offensive; (2) her gender was the cause of the harassment; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. *Orton-Bell*, 759 F.3d at 773 (citing *Chaib v. Indiana*, 744 F.3d 974, 985 (7th Cir. 2014)).

In determining whether employment conditions rise to the level of a hostile work environment, courts consider the totality of the circumstances, including the severity of the allegedly harassing conduct, its frequency, whether it was physically threatening or

humiliating or merely offensive, and whether it unreasonably interfered with the plaintiff's work performance. *Mercer v. Cook Cnty., Ill.*, 527 F. App'x 515, 520 (7th Cir. 2013) (citing *Porter v. City of Chicago*, 700 F.3d 944, 955-56 (7th Cir. 2012); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Title VII is not a general civility code; "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are not actionable under that statute. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotations omitted). Rather, the plaintiff must show that her work environment was one that both she and "a reasonable person would find hostile or abusive." *Gentry v. Exp. Packaging Co.*, 238 F.3d 842, 850 (7th Cir. 2001) (quoting *Faragher*, 524 U.S. at 787).

Plaintiff relies on Burge's statements containing lewd language in the February 8 and 9, 2008 conversations to show that she was subjected to a hostile work environment, but those statements do not meet the above standard. (Doc. 50, at 7-8). Burge's February 8, 2008 statement that C.W. 1 had "[his] dick in [C.W. 2's] mouth last night," while vulgar and offensive to Plaintiff, was not directed at her, or even at women in general, but was merely overheard by her. Crude comments by coworkers that "offend one, however deeply, do[] not amount to harassment if one is not within the target area of the offending comment." *Yuknis v. First Student, Inc.*, 481 F.3d 552, 554 (7th Cir. 2007); *see also id.* at 556 (Title VII was not meant to provide redress for "complaints of being offended by remarks and behaviors unrelated to the complainant except for his having overheard, or heard of, them"). Nothing about Burge's statement or the February 8, 2008 conversation shows that anything of a hostile, insulting, or

threatening nature was being said to or about Plaintiff, either directly or indirectly, based on her gender.

During the February 9, 2008 incident, Burge told Plaintiff that he was going to tell her friend that he had put his "dick in [Plaintiff's] mouth," and repeated this statement when Plaintiff asked him, "What did you say?" Although Burge used lewd language in conversing with Plaintiff, no reasonable jury could find this isolated incident of vulgar banter created a hostile work environment. *See, e.g.*, *Baskerville v. Culligan Intern. Co.*, 50 F.3d 428, 430-31 (7th Cir. 1995) (manager's statements to secretary that she was a "pretty girl," that his office had become "hot" when she walked into it, that an announcement over the public-address system meant that "[a]ll pretty girls run around naked," his grunting at her in a sexually suggestive manner, and his simulation of masturbation in front of her, were not sufficient to support a hostile work environment claim); *Cherry v. City of Chicago*, 833 F. Supp. 2d 907, 912 (N.D. Ill. 2011) (supervisor's offer to "stick his tongue down [plaintiff's] throat" after she complained it was sore, and statements that he was jealous of plaintiff's husband because she was "thick," which was how he "like[d] them," were not sufficient to support a hostile work environment claim).

In the cases Plaintiff cites in support of her argument that Burge's conduct created a hostile work environment, the supervisors engaged in various humiliating or threatening acts, such as unwanted touching, or *quid pro quo* harassment. *See Urban v. Blossom Hill Health Centre, Inc.*, No. 97-C 5507, 2000 WL 1262937, at *11 (N.D. Ill. Sept. 1, 2000) (supervisor allegedly touched plaintiff on a regular basis for a month and a half, and implied that plaintiff would lose her job if she refused to socialize with him);

*Glemser v. Sugar Creek Realty, LLC*, No. 09-3321, 2010 WL 375166, at *1 (C.D. Ill. Jan. 26, 2010) (supervisor allegedly unbuttoned plaintiff's pants without her consent, and forced her to put on underwear that had been worn by other people, among other acts); *Marchioni v. Bd. of Educ. of City of Chicago*, 341 F. Supp. 2d 1036, 1045-46 (N.D. Ill. 2004) (principal allegedly asked plaintiff to dance on his desk in exchange for better work conditions, and then physically restrained her while thrusting his pelvis against her). Plaintiff does not allege that Burge touched her or made any *quid pro quo* requests or threats against her.

Plaintiff does argue that when Burge stated "that's what I'm going to do" during the February 9, 2008 conversation, he was "indicating his intention to put his penis in [her] mouth," which was severe enough to create an objectively hostile work environment. (Doc. 50, at 7-9). Contrary to Plaintiff's argument, even when all reasonable inferences are drawn in her favor, the evidence does not show that Burge either threatened or invited her to engage in a sexual act. Plaintiff's deposition testimony regarding the February 9, 2008 conversation, which is the only evidence she cites in support of her argument, was, in pertinent part, as follows:

> Q. Okay. And what did he [Burge] say – What happened after he said I'm going to get him?
>
> A. He [Burge] said I'm going to get him [Plaintiff's friend] the next time – Yeah, I'm going to get him the next time he come up here. That's what he said. He said, I'm going to get him the next time he come up here. I'm going to say – I'm going to make him really mad. Yeah, I'm going to make him mad. And he said, Yeah. I'm going to say, Yeah, Ms. Williams acting funny now. Well, she wasn't acting funny when I had my dick in her mouth, like that.
>
> And then I was like, what you say, Mr. Burge? He's like, Yeah, you heard me. That's what I said. That's what I'm

going to do. All that – you know, he said the whole thing over
again. And then –

Q.      The whole thing that?

A.      Like put your . . .

Q.      This is important, so I need to hear it.

A.      Oh, I'm sorry.

Q.      You can't – this is the part where we can't just glaze
over.  So you told me about the first time he said it.  And
then you said, "What did you say?"

A.      Yes.

Q.      And then he said, "You heard it." And he said what
next?

A.      He said, when he come up here, I'm gonna – he
repeated exactly what he said. When he come up here, I'm
going to say, Yeah, Ms. Williams acting funny now, but she
wasn't acting funny when I had my dick in her mouth.

(Doc. 49-2, at 30).  Plaintiff testified that when Burge said, "[t]hat's what I'm going to do,"

he was referring to his plan to say he had put his "dick in her mouth" to her friend.  (*Id.*).

No reasonable person could infer from Plaintiff's testimony that Burge was threatening,

or requesting, to actually engage in a sexual act with her.

Moreover, the cases Plaintiff cites in support of her argument do not hold that a

supervisor's single, verbal threat or solicitation for a sexual act from the employee can

create a hostile work environment.   Most of the cases she cites involved alleged

physical contact, not just verbal statements, and are thus distinguishable from this case.

*See Marchioni*, 341 F. Supp. 2d at 1045; *see also Smith v. Sheahan*, 189 F.3d 529, 531

(7th Cir. 1999) (male co-worker called female plaintiff a "bitch," threatened to "fuck [her]

up," pinned her against a wall, and twisted her wrist severely enough to damage her ligaments, draw blood, and require surgical correction).[3]

The only case Plaintiff cites in which the Seventh Circuit held that a reasonable jury could find that verbal statements alone created a hostile work environment is distinguishable due to the severity of the statements in that case. In *Rizzo v. Sheahan*, a female employee alleged that her male supervisor told her that he wanted to "fuck" her fifteen-year-old daughter, who was waiting nearby for her mother to finish her shift. 266 F.3d 705, 709 (7th Cir. 2001). A few months later, the supervisor again allegedly told the employee that he had seen her daughter at a restaurant the evening before and "would like to fuck" her. *Id.*

The Seventh Circuit held that the supervisor's comments were "extremely severe," and that the "sexually explicit comments made to a mother by her supervisor in reference to her fifteen-year-old daughter are significantly more offensive than" other conduct it had previously found insufficient to constitute harassment. *Id.* at 712. The court specifically distinguished *Rizzo* from *Baskerville*, discussed above, and *McKenzie v. Illinois Department of Transportation*, 92 F.3d 473 (7th Cir. 1996), a case in which a supervisor told a female employee that her co-worker had "screwed around with [her] so much [she was] probably pregnant," stated that drinking coffee induces sexual arousal before asking her if she was drinking coffee, and implied that another co-worker should have allowed her to participate in a baseball pool in exchange for sexual favors. *Id.* The Seventh Circuit noted that the employee in *Rizzo*, as a mother, could be even more

---

[3]     Plaintiff also cites *Chalmers v. Quaker Oats Company*, 859 F. Supp. 1149 (N.D. Ill. 1994), but that was an action brought under ERISA to review whether a severance committee's denial of benefits due to the plaintiff's violation of his employer's sexual harassment policy was supported by evidence, not whether the plaintiff's conduct created a hostile work environment under Title VII.

disturbed by her supervisor's comments involving her minor daughter than by being personally subjected to unwanted sexual advances herself. *Id.*

In this case, Plaintiff does not allege that Burge made sexually-explicit comments regarding any of her children, or anything as severe as the statements allegedly made in *Rizzo*. Instead, her allegations are closer to the crass comments made to the employees in *Baskerville* and *McKenzie*. Plaintiff argues that the sexually explicit nature of Burge's comments made them extremely severe, like the supervisor's comments in *Rizzo*. However, Burge's statements that he would falsely tell Plaintiff's friend he had put his "dick in her mouth" are no more sexually explicit than the simulation of masturbation in *Baskerville*, or the statement in *McKenzie* that the plaintiff had "screwed around" with her co-worker. Burge's statements are not so sexually explicit that a reasonable person could find that, through their severity alone, they created a hostile or abusive work environment. Even when considering these comments in conjunction with Burge's comments to C.W. 1 on February 8, 2008, no reasonable jury could find that Burge's conduct was severe or pervasive enough to create a hostile or abusive work environment. Accordingly, the Court grants summary judgment in favor of Defendant on Plaintiff's hostile work environment claim.

**C.    Plaintiff's Retaliation Claim**

In Plaintiff's second claim, she alleges that Defendant terminated her in retaliation for complaining about Burge's conduct. An employer may not retaliate against an employee for opposing practices made unlawful under Title VII, or for making a charge, testifying, assisting, or participating in an investigation, proceeding or hearing under Title VII. 42 U.S.C. § 2000e–3(a); *see also Crawford v. Metro. Gov't of Nashville*

& *Davidson Cnty., Tenn.*, 555 U.S. 271, 274 (2009).  A plaintiff can establish retaliation using either the direct or indirect method of proof.  *See Orton-Bell*, 759 F.3d at 773.  Plaintiff argues that she has presented enough evidence to survive summary judgment under both methods, but the Court finds she cannot survive summary judgment under either method.

### 1.    Direct Method of Proof

To survive summary judgment on a Title VII retaliation claim under the direct method of proof, a plaintiff must submit evidence from which a jury could reasonably conclude that (1) she engaged in a statutorily protected activity, (2) her employer took a materially adverse action against her, and (3) she would not have suffered the adverse action but-for her participation in the protected activity.  *Malin v. Hospira, Inc.*, No. 13-2433, —F.3d—, 2014 WL 3896175, at *6 (7th Cir. 2014) (citing *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008)); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).  Defendant agrees that Plaintiff has met the first two elements of this method of proof, because her internal complaints to its human resources department and charges filed with the EEOC constituted protected activity, and she suffered an adverse employment action when she was terminated.  (Doc. 45, at 11; Doc. 52, at 9-10).  The parties dispute whether Plaintiff has met the third element.

A plaintiff may rely on either direct or circumstantial evidence to support her claim under the direct method of proof.  *Malin*, 2014 WL 3896175, at *6 (citing *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012)).  Plaintiff concedes that in this case, as in most retaliation cases, there is no direct evidence, such as a "smoking gun" confession, showing Defendant terminated her for engaging in protected activity.  (Doc. 50, at 10).

She argues instead that she has presented a "convincing mosaic" of circumstantial evidence from which a reasonable jury could determine that she was terminated for engaging in protected activity. (*Id.* at 10-12).

"A convincing mosaic must include evidence from which an inference of retaliatory intent could be drawn, and . . . could include: (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643-44 (7th Cir. 2013) (internal quotation omitted). The Seventh Circuit has cautioned that the concept of a "convincing mosaic" is merely a rhetorical tool, and the suggested types of circumstantial evidence the "mosaic" could include are "not exclusive, nor are they a set of prongs of a circumstantial evidence 'test.'" *Id.* at 644. Rather, the "ultimate question" is whether, when drawing all reasonable inferences in a plaintiff's favor, a reasonable jury could find it is "more likely than not that the plaintiff was subjected to the adverse employment action because of his protected . . . activity." *Id.* Plaintiff cites a combination of factors to show her retaliation claim should survive summary judgment, but none of them stand up to scrutiny. (Doc. 50, at 11-12).

As the first factor in her "convincing mosaic," Plaintiff argues that there is suspicious timing in this case, because she was terminated less than three months after complaining to Defendant's human resources department about Burge's behavior, and twenty-nine days after she filed her April 3, 2008 EEOC charge. (Doc. 50, at 11).

Sometimes "an adverse action comes so close on the heels of a protected act that an inference of causation is sensible." *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 675 (7th Cir. 2011) (quoting *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011)). The context in which the adverse action and the protected act occurred is essential to assessing whether it would be reasonable to infer causation from "suspicious timing." *Id.* When a significant intervening event separates the protected act from the adverse action, an inference that the protected act caused the adverse action is not warranted. *See id.* (employee's participation in a questionable transaction during the days between his complaints and his discharge was a significant intervening event that defeated his suspicious-timing argument); *see also Hall v. Bodine Elec. Co.*, 276 F.3d 345, 359 (7th Cir. 2002) ("[A]n employee's complaint of harassment does not immunize her from being subsequently disciplined or terminated for inappropriate workplace behavior.").

Here, after Plaintiff made her internal complaints to Defendant's human resources department and filed her April 3, 2008 EEOC charge, she repeatedly called in sick when she had no available sick time, including after she had been warned that she could be disciplined for her conduct. Furthermore, Plaintiff's termination occurred immediately after she called in sick on a day that she had requested off, but was denied. Because of these significant intervening events, it is not reasonable to infer from the proximity of Plaintiff's protected acts to her termination that Defendant terminated her because she engaged in protected activity.

Plaintiff also argues that several RES staff members in the Halfway Back Program who did not engage in any statutorily protected activities were granted "more

leniencies" related to attendance issues than she was.[4]  (Doc. 50, at 11-12).  Although she generally states that Defendant's absence policies were applied in a lenient manner, and that Veal and Burge granted people "breaks," she fails to cite any instances in which her proposed comparators were given a "break" that she was not given.  (Doc. 50, at 4-5).  Instead, the only specific evidence that Plaintiff cites in support of this argument is that some other RES staff members were issued PIPs in relation to their attendance issues, while she was never issued any PIPs.  (*Id.* at 11-12).  She argues that Defendant issued PIPs to her proposed comparators to improve their attendance, but since she was not issued any PIPs, Defendant made no effort to improve her attendance, in retaliation for her protected acts.  (*Id.*).  The evidence does not support Plaintiff's argument.

Plaintiff's assertion that Defendant made no effort to improve her attendance is undermined by her admissions that (1) at her request, she was granted an additional week before her shift change would take effect, to allow her more time to adjust to the scheduling change; (2) Veal referred her to the Employee Assistance Program at the Center for help dealing with the shift change; (3) Veal gave her a verbal warning when she had exhausted all of her available sick days; and (4) she received a written warning on March 14, 2008, which contained reminders of Defendant's policies and notified her of its concerns regarding her absenteeism.  Plaintiff also does not explain how receiving

---

[4]     The parties disagree as to who qualifies as a similarly-situated employee, or "comparator," of Plaintiff.  Defendant argues that only RES staff with excessive full-shift absences, not merely those who were late for work on several occasions, are similarly situated to Plaintiff.  (Doc. 45, at 12-13).  Plaintiff disagrees.  (Doc. 50, at 14-15).  The Court does not need to determine whether RES staff who were late for work, but not excessively absent for full-shifts, are also comparators of Plaintiff, because it finds that she presents no evidence that any of her proposed comparators received better treatment than she did.

PIPs constitutes better or more lenient treatment than the warnings and scheduling accommodation she received.

Furthermore, the PIPs Plaintiff submitted as evidence do not suggest that she and her proposed comparators were subject to any disparate treatment. Employees who received PIPs due to absenteeism were generally advised to "report on time," to do "no more calling off," or to "improve on attendance," and informed that a lack of improvement could lead to "further disciplinary action . . . up to and including discharge." (Doc. 49-7, at 6, 25, 40, 42-44, 57-59, 61, 66, 69-71, 75). No reasonable person could infer from the PIPs, which contain similar language as the written warning Plaintiff received, that the proposed comparators received better treatment than she did.

As the final factor in her "convincing mosaic," Plaintiff argues that she has presented evidence that Defendant's reason for terminating her—excessive absenteeism—is pretextual. (Doc. 50, at 12). To show pretext, a plaintiff must present evidence showing that the employer's stated reason for taking an adverse action against her is not the actual reason, but is instead a lie. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). In support of her argument that Defendant's reason for terminating her is pretextual, Plaintiff cites the fact that C.W. 2, her team leader, issued her a certificate of good attendance on April 24, 2008. (Doc. 50, at 12). She argues that Defendant would not have issued her such a certificate if it thought she should be terminated for absenteeism. (*Id.*).

The parties dispute whether the certificate C.W. 2 gave to Plaintiff was authorized by Defendant, but the resolution of that dispute is immaterial to this motion. The undisputed evidence is that within three days of receiving the certificate, Plaintiff

called in sick despite having used up all of her sick days, and then called in sick again a mere four days later on the day that she had requested, but was explicitly denied, the day off to prepare for a funeral. These absences followed several other admittedly unexcused absences, and immediately preceded her termination for excessive absenteeism. Plaintiff also admits that Veal and Burge made the recommendation to terminate her, not C.W. 2, the person who gave her the certificate. Plaintiff presents no evidence from which a reasonable person could infer that her receipt of the certificate from C.W. 2 was inconsistent with Defendant's proffered reason for her termination.

As additional evidence of pretext, Plaintiff also relies on the fact that both Veal and Burge knew about her complaints to human resources when they recommended she be terminated. But "mere knowledge of the plaintiff's protected activity prior to an adverse employment action does not establish a retaliatory motive." *Sanchez v. Henderson*, 188 F.3d 740, 747 (7th Cir. 1999) (citing *Johnson v. Sullivan*, 945 F.2d 976, 981 (7th Cir. 1991)). Plaintiff cites no evidence indicating that Veal's or Burge's knowledge of her internal complaints actually motivated them to recommend her termination.

In sum, Plaintiff has not submitted sufficient circumstantial evidence from which a jury could reasonably conclude that Defendant fired her because of her complaints regarding Burge's behavior and charges filed with the EEOC. As a result, she has not established a prima facie case of retaliation under the direct method of proof.

**2.    Indirect Method of Proof**

To survive summary judgment on a Title VII retaliation claim under the indirect method of proof, a plaintiff must provide proof that (1) she engaged in a statutorily

protected activity; (2) met her employer's legitimate expectations; (3) suffered a materially adverse action; and (4) was treated less favorably than some similarly situated employee who did not engage in the statutorily protected activity. *Vaughn v. Vilsack*, 715 F.3d 1001, 1006 (7th Cir. 2013) (quoting *Harper v. C.R. England, Inc.*, 687 F.3d 297, 309 (7th Cir. 2012)). If a plaintiff establishes all of these elements, the burden shifts to the defendant to offer a non-retaliatory reason for adverse action. *Id.* If the defendant does so, then the burden shifts back to the plaintiff to show that the proffered reason is pretextual. *Id.* As stated above, the parties do not dispute that Plaintiff engaged in statutorily protected activity, or that she suffered an adverse action. However, Defendant denies that Plaintiff has shown she met the employer's legitimate expectations, and that she was treated less favorably than a similarly situated employee who did not engage in protected acts. (Doc. 45, at 12-14; Doc. 52, at 13-14). Defendant also argues that it has provided a non-retaliatory reason for Plaintiff's termination—excessive absenteeism—and that she has not provided proof that this reason is pretextual. (Doc. 45, at 14-15; Doc. 52, at 14-15).

Under the indirect method, Plaintiff offers the same evidence as she did under the direct method in support of her argument that her proposed comparators were treated more favorably than her. Namely, she argues that some RES staff were given PIPs in response to their excessive absenteeism, while she was not. (Doc. 50, at 14). For the same reasons discussed above, the Court finds that no reasonable jury could infer from the PIPs that Plaintiff was treated less favorably than Defendant's employees who received PIPs, and thus she has not met her burden of proof on this element of her prima facie case. For this reason alone, Plaintiff's entire argument under the indirect

method of proof fails, since "[i]f any one of the elements of the plaintiff's prima facie case is lacking, the plaintiff loses." *Hobgood*, 731 F.3d at 642. However, for the sake of completeness, the Court will briefly address Plaintiff's other arguments.

Plaintiff argues that there is no evidence in the record indicating that she did not perform her job to Defendant's legitimate expectations. (Doc. 50, at 13-14). But the uncontradicted evidence in the record is that Plaintiff called in sick on numerous days when she had no sick time. Coming to work is an implicit and legitimate expectation of any employer, and Plaintiff's excessive absences show she did not meet that expectation. *See Contreras v. Suncast Corp.*, 237 F.3d 756, 760 (7th Cir. 2001); *see also Oates v. Discovery Zone*, 116 F.3d 1161, 1171 (7th Cir. 1997) (repeated absenteeism and failure to follow attendance reporting procedures are tantamount to unsatisfactory job performance). Plaintiff refers to her absenteeism as "alleged absenteeism," but she does not dispute that she called in sick at least six times after she was advised that she had no available sick time, or that she used sick days in conjunction with scheduled days off, in violation of Defendant's policies. (Doc. 50, at 13-14). Plaintiff has not raised a genuine issue of material fact that she was meeting Defendant's legitimate employment expectations.

Plaintiff does argue, however, that her absenteeism should not be considered in connection with whether she meets element two of her prima facie case, since she has presented evidence that her absenteeism was a pretextual reason to terminate her. (Doc. 50, at 14-15). In support, Plaintiff cites the same evidence she used to show pretext under the indirect method of proof, and for the same reasons discussed above, the Court finds that she fails to raise a genuine issue of material fact regarding whether

Defendant's proffered reason was pretextual. As a result, Plaintiff also has not met her burden under the indirect method of proof to survive summary judgment on her retaliation claim.[5]

## **CONCLUSION**

For the reasons stated above, Defendant's Motion for Summary Judgment (Doc. 42) is granted. The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: October 10, 2014

SHEILA FINNEGAN
United States Magistrate Judge

---

[5]    In the Complaint, Plaintiff alleged that Defendant also changed her shift in retaliation for her complaints, (Doc. 1, at 3, 5), but now admits that the shift change was imposed on all RES staff, and was not retaliatory conduct. (Doc. 44 at ¶ 14).

Plaintiff also alleged in her Complaint that she was subjected to "unwarranted discipline" in retaliation for her complaints. (Doc. 1, at 3, 5). In her opposition to Defendant's motion, she states in two sentences that her ejection from the February 29, 2009 staff meeting was unwarranted, and that Defendant gave false reasons for ejecting her. (Doc. 50, at 4). She does not otherwise develop this argument, and as a result the argument is waived. *See Anderson v. Office of Chief Judge of Circuit Court of Cook Cnty., Ill.*, 12 C 00627, 2014 WL 4358476, at *9 (N.D. Ill. Sept. 3, 2014) (citing *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010)) (plaintiff waived argument that she was terminated in retaliation for filing EEOC complaints where brief contained no argument or citation to facts establishing a causal link between those events).